# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 6, 2017　　　　Decided April 27, 2018

No. 17-5093

SOUNDBOARD ASSOCIATION,
APPELLANT

v.

FEDERAL TRADE COMMISSION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00150)

*Karen Donnelly* argued the cause for appellant. With her on the briefs was *Errol Copilevitz. Daniel W. Wolff* entered an appearance.

*Matthew M. Hoffman*, Attorney, Federal Trade Commission, argued the cause for appellee. With him on the brief were *David C. Shonka*, Acting General Counsel, and *Joel Marcus*, Deputy General Counsel. *Michele Arington* and *Leslie R. Melman* Assistants General Counsel, and *Bradley Grossman*, Attorney, entered appearances.

*Thomas C. Bennigson* was on the brief for *amicus curiae* Public Good Law Center in support of appellee.

Before: ROGERS, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Dissenting Opinion filed by *Circuit Judge* MILLETT.

WILKINS, *Circuit Judge*: This appeal arises from Appellant Soundboard Association's ("SBA's") challenge to a November 10, 2016 informal opinion letter (the "2016 Letter") issued by Federal Trade Commission ("FTC" or "Commission") staff. The 2016 Letter stated it was the FTC staff's opinion that telemarketing technology used by SBA's members is subject to the FTC's regulation of so-called "robocalls," and it announced the rescission of a 2009 FTC staff letter (the "2009 Letter") that had reached the opposite conclusion.

SBA filed suit seeking to enjoin rescission of the 2009 Letter. It argued the 2016 Letter violated the Administrative Procedure Act ("APA") because it was a legislative rule issued without notice and comment and because the FTC's robocall regulation unconstitutionally restricted speech on the basis of content. The FTC opposed both these arguments and also disputed that the 2016 Letter was reviewable final agency action. The District Court concluded the 2016 letter qualified as reviewable final agency action, but the court granted summary judgment for the FTC on the grounds that the 2016 Letter was an interpretive rule not subject to notice and comment and that the interpretation stated in the letter survived First Amendment scrutiny.

We conclude that because the 2016 staff opinion letter does not constitute the consummation of the Commission's decisionmaking process by its own terms and under the FTC's

regulations, it is not final agency action. As SBA concedes, its speech claims are pleaded as APA claims under 5 U.S.C. § 706(2)(B) and cannot proceed without final agency action. We therefore vacate the decision below and dismiss the case for failure to state a cause of action under the APA.

## I.

### A.

SBA is a trade association for companies that manufacture or use "soundboard" telemarketing technology ("soundboard"). Soundboard enables telemarketing agents to communicate with customers over the phone by playing pre-recorded audio clips instead of using the agent's live voice. The agent can choose a pre-recorded clip to ask questions of or respond to a customer, while retaining the ability to break into the call and speak to the customer directly. Soundboard also enables agents to make and participate in multiple calls simultaneously. According to SBA, soundboard provides many advantages to telemarketers, including ensuring accurate communication of information and disclaimers, improving call-center performance and cost-effectiveness, and employing individuals who would otherwise have difficulty being understood over the phone due to accent or disability. J.A. 85-86.

The FTC regulates telemarketing pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994, which directs the Commission to "prescribe rules prohibiting deceptive . . . and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). In 1995, the Commission promulgated the Telemarketing Sales Rule ("TSR"), which restricts telemarketing to certain times of day, creates the "do-not-call" list, and imposes other requirements

to prevent fraud, abuse, and intrusions on customer privacy. 60 Fed. Reg. 43842 (Aug. 23, 1995); 16 C.F.R. § 310.4(b)(ii), (c). In 2003, the Commission amended the TSR to more closely regulate "predictive dialing," which places multiple simultaneous calls for a single call-center agent and, therefore, can result in "call abandonment" – i.e., abruptly hanging up – when too many customers answer the phone. The 2003 amendment prohibited telemarketers from failing to connect a customer to an agent within two seconds of the customer's completed greeting. 16 C.F.R. § 310.4(b)(1)(iv). The amendment thus effectively prohibited outbound telemarketing campaigns consisting "solely of prerecorded messages" – colloquially known as robocalls – because "consumers who receive a prerecorded message would never be connected to a sales representative." 73 Fed. Reg. 51,164, 51,165 (Aug. 29, 2008).

In 2008, the Commission amended the TSR to prohibit telemarketers from "initiating any outbound telephone call that delivers a prerecorded message" without "an express agreement, in writing" from the consumer with language demonstrating the individual customer's consent to receiving such calls from that telemarketer. *Id.* at 51,184; 16 C.F.R. § 310.4(b)(1)(v)(A). The express-written-consent requirement does not apply to calls made on behalf of charitable organizations intended to "induce a charitable contribution from a member of, or previous donor to," the organization, as long as the donor can opt out of such calls. 16 C.F.R. § 310.4(b)(1)(v)(B). The Commission justified this exception on the grounds that members and prior donors have consented to receiving future charitable solicitation calls and, as a result,

have a reduced privacy interest vis-à-vis a charitable organization's speech interest. *See* 73 Fed. Reg. at 51,193-94.

In promulgating the 2008 amendments, the Commission explained that the comments it received from customers and industry showed "the reasonable consumer would consider interactive prerecorded telemarketing messages to be coercive or abusive of such consumer's right to privacy. The mere ringing of the telephone to initiate such a call may be disruptive; the intrusion of such a call on a consumer's right to privacy may be exacerbated immeasurably when there is no human being on the other end of the line." *Id.* at 51,180. The Commission also rejected the industry's argument that an interactive opt-out mechanism for robocalls would adequately protect consumer privacy, reasoning that the "volume of telemarketing calls from multiple sources is so great that consumers find even an initial call from a telemarketer or seller to be abusive and invasive of privacy." *Id.* (quotation marks omitted).

**B.**

Before the TSR went into effect in September 2009, a telemarketer and soundboard user, Call Assistant LLC ("Call Assistant"), submitted a "request for a FTC <u>Staff Opinion Letter</u>" regarding whether Call Assistant's use of soundboard was subject to the 2008 amendments. J.A. 230 (emphasis in original). In its request, Call Assistant represented that "[a]t all times" during a soundboard call, "even during the playing of any recorded segment, the agent retains the power to interrupt any recorded message." J.A. 37. It also represented that during

soundboard calls, "live agents hear every word spoken by the call recipient, and determine what is said" in response. J.A. 38.

On September 11, 2009, FTC staff responded with an "informal staff opinion" letter from Lois Greisman, the FTC's Associate Director of the Division of Marketing Practices (the "2009 Letter"). J.A. 37. The 2009 Letter stated that "[b]ased on the description of the technology included in [Call Assistant's] letter," "the staff of the [FTC] has concluded that the 2008 TSR Amendments . . . do not prohibit telemarketing calls using" soundboard. J.A. 38. Greisman explained that the robocall regulation "prohibit[s] calls that deliver a prerecorded message and do not allow interaction with call recipients in a manner virtually indistinguishable from calls conducted by live operators. Unlike the technology that [Call Assistant] describe[s], the delivery of prerecorded messages in such calls does not involve a live agent who controls the content and continuity of what is said to respond to concerns, questions, comments – or demands – of the call recipient." *Id.* Greisman quoted the FTC's justification for the TSR's prohibition on robocalls, which "convert the telephone from an instrument for two-way conversations into a one-way device for transmitting advertisements." *Id.* Given Call Assistant's assertions that soundboard calls featured a "live human being continuously interact[ing] with the recipient of a call in a two-way conversation," "in Staff's view," soundboard use did not implicate the purposes of the TSR. *Id.*

The 2009 Letter expressly conditioned this conclusion on the factual representations in Call Assistant's request for a staff opinion, and Griesman advised Call Assistant that the letter did not represent the views of the Commission:

> Please be advised that this opinion is based on all the information furnished in your request.

> This opinion applies only to the extent that actual company practices conform to the material submitted for review. Please be advised further that the views expressed in this letter are those of the FTC staff. They have not been reviewed, approved, or adopted by the Commission, and they are not binding upon the Commission. However, they do reflect the opinions of the staff members charged with enforcement of the TSR.

J.A. 39.

After issuing the 2009 Letter, the Commission began to receive consumer complaints and to observe media reports about the use of soundboard that conflicted with factual representations made by Call Assistant. This included complaints that consumers "are not receiving appropriate recorded responses to their questions or comments," that "no live telemarketer intervenes to provide a human response when requested to do so," and that "the call is terminated in response to consumers['] questions." J.A. 30-31. FTC staff also collected evidence from consumers and industry stakeholders that "some companies are routinely using soundboard technology" to "conduct separate conversations with multiple consumers at the same time," and observed that companies engaging in these practices were using the 2009 Letter as a defense against consumer lawsuits. J.A. 31; 225.

The FTC staff began to reconsider the 2009 Letter. In early 2016, FTC staff contacted telemarketing industry groups for input and held meetings at which industry representatives made presentations about soundboard. In a February 2016 meeting, "representatives of [a telemarketing trade group] acknowledged that soundboard technology is frequently

utilized in a matter to allow one live agent to handle multiple calls simultaneously." J.A. 226. A trade group representative also told FTC staff "that if the FTC enforced a requirement that one agent could only manage one call at a time, no call center would use soundboard technology because it would not be cost effective – i.e., the capital expenditure in implementing soundboard . . . only made business sense if a call center could increase the volume of calls its agents could handle." *Id.* During this time SBA argued to FTC staff that the practices described in consumer complaints were contrary to the trade groups' code of conduct, and that bad actors should be punished instead of the entire soundboard industry. J.A. 147-48.

On November 10, 2016, FTC staff issued a letter (the "2016 Letter") concluding that the TSR did apply to soundboard calls and rescinding the 2009 Letter effective May 12, 2017. The 2016 Letter was from Greisman, as well. It noted the 2009 Letter was premised on factual representations made by Call Assistant. But based on consumer complaints, media reports, meetings with industry representatives, and other data points, by 2016 the FTC staff believed the factual bases of the 2009 Letter were faulty. Specifically,

> A fundamental premise of [the] September 2009 letter was that soundboard technology was a surrogate for the live agent's actual voice. A human being cannot conduct separate conversations with multiple consumers at the same time using his or her own voice. Nonetheless, some companies are routinely using soundboard technology in precisely this manner [of enabling an agent to handle multiple simultaneous calls] . . . Indeed, Call Assistant noted publicly that one of the

> advantages of its technology is that an agent can conduct multiple calls simultaneously.

J.A. 31-32 (internal quotation marks omitted).

The 2016 Letter also stated that because soundboard users play prerecorded audio files to communicate with customers, soundboard calls fall within the plain language of the TSR's prohibition on "any outbound telephone call that delivers a prerecorded message." J.A. 30. Accordingly, the letter reasoned,

> Given the actual language used in the TSR, the increasing volume of consumer complaints, and all the abuses we have seen since we issued the September 2009 letter, we have decided to revoke the September 2009 letter. It is now staff's opinion that outbound telemarketing calls that utilize soundboard technology are subject to the TSR's prerecorded call provisions because such calls do, in fact, "deliver a prerecorded message" as set forth in the plain language of the rule. Accordingly, outbound telemarketing calls made using soundboard technology are subject to the provisions of 16 C.F.R. § 310.4(b)(1)(v), and can only be made legally if they comply with the requirements [applicable to robocalls].

J.A. 32 (footnote omitted).

The 2016 Letter provided that "[i]n order to give industry sufficient time to make any necessary changes to bring themselves into compliance, the revocation of the September 2009 Letter will be effective six months from today, on May

12, 2017. As of that date, the September 11, 2009 letter will no longer represent the opinions of FTC staff." J.A. 33. The 2016 Letter concluded by stating that "the views expressed in this letter are those of the FTC staff, subject to the limitations of 16 C.F.R. § 1.3. They have not been approved or adopted by the Commission, and they are not binding upon the Commission. However, they do reflect the views of staff members charged with enforcement of the TSR."[1] *Id.*

## C.

SBA sought to enjoin the revocation of the 2009 Letter and what it characterized as a compliance deadline of May 12, 2017. It argued before the District Court that the 2016 Letter is a legislative rule requiring notice and comment under 5 U.S.C. § 553 because it expanded the scope of the TSR to reach soundboard. It also argued that to the extent the 2016 Letter amends the TSR to apply to soundboard, it is a content-based speech restriction that "treat[s] speech tailored for first-time donors differently than speech tailored for previous donors." J.A. 191. The Commission moved for summary judgment. It argued the 2016 Letter was not a reviewable final agency action, and in any event was an interpretive rule not subject to notice and comment. The Commission also argued that the SBA's affirmative First Amendment challenge was barred by the APA's six-year statute of limitations, but that on the merits

---

[1] 16 C.F.R. § 1.3(c) provides that "[a]dvice rendered by the staff is without prejudice to the right of the Commission later to rescind the advice and, where appropriate, to commence an enforcement proceeding."

the TSR was a reasonable time, place, and manner restriction that survived intermediate scrutiny.

The District Court consolidated the motions as cross-motions under Rule 56 and granted summary judgment for the Commission. The court concluded the 2016 Letter was a final agency action but held it was an interpretive rule not subject to notice and comment, and that the TSR's application to SBA survived the intermediate scrutiny applicable to regulations of commercial speech. SBA timely appealed.

## II.

This court "review[s] *de novo* a district court's decision to grant summary judgment, viewing the evidence in the light most favorable to the non-moving party. A party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006) (quotation marks omitted).

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. While the requirement of finality is not jurisdictional, without final agency action, "there is no doubt that appellant would lack a cause of action under the APA." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003); *Flytenow, Inc. v. FAA*, 808 F.3d 882, 888 (D.C. Cir. 2015). Agency actions are final if two independent conditions are met: (1) the action "mark[s] the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature;" and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted); *see also Scenic Am. v. U.S. Dep't of Transp.*, 836 F.3d 42, 55-56 (D.C. Cir. 2016). "An order must satisfy both prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).

In evaluating the first *Bennett* prong, this Court considers whether the action is "informal, or only the ruling of a subordinate official, or tentative." *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967) (internal citations omitted). The decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue. *See Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (relying upon the FDA Manual's description of warning letters as preceding enforcement action to conclude they "do not mark the consummation of FDA's decisionmaking"); *Reliable Automatic Sprinkler*, 324 F.3d at 732, 733 (holding a letter interpreting a safety regulation was not a final agency action because "the Commission itself ha[d] never considered the issue," and "[t]he Act and the agency's regulations clearly prescribe a scheme whereby the agency must hold a formal, on-the-record adjudication before it can make any determination that is legally binding."); *see also Sw. Airlines*, 832 F.3d at 275 (In evaluating finality, this Court also looks to "the way in which the agency subsequently treats the challenged action.").

Because each prong of *Bennett* must be satisfied independently for agency action to be final, deficiency in either is sufficient to deprive SBA of a cause of action under the APA. *Sw. Airlines*, 832 F.3d at 275.

13

## III.

## A.

SBA argues, and the District Court concluded below, that the extensive investigative efforts by FTC staff and some definitive language in the 2016 Letter render it the consummation of agency decisionmaking for "all intents and purposes." *Soundboard Ass'n v. FTC*, 251 F. Supp. 3d 55, 54 (D.D.C. 2017). We disagree.

There is no dispute that the 2016 Letter was "informal" and "only the ruling of a subordinate official," and not that of any individual Commissioner or of the full Commission. *Abbott Labs.*, 387 U.S. at 151 (citations omitted). It is readily distinguishable from the final agency action in *Frozen Food Express v. United States*, relied upon by SBA and the decision below. That case involved a formal, published report and order of the Interstate Commerce Commission, not its staff, following an investigation and formal public hearing. 351 U.S. 40, 41 (1956). Similarly, unlike the jurisdictional determination in *U.S. Army Corps of Engineers v. Hawkes Co.*, which was issued by the agency and expressly deemed "final agency action" by regulation, was "valid for a period of five years," and was "bind[ing on] the Corps for five years," 136 S. Ct. 1807, 1814 (2016), the 2016 Letter is issued by staff under a regulation that distinguishes between Commission and staff advice, is subject to rescission at any time without notice, and is not binding on the Commission. 16 C.F.R. § 1.3(c). This factor also distinguishes this case from *Sackett v. EPA*, 566 U.S. 120 (2012), in which a binding enforcement order issued

by the EPA Administrator was deemed the consummation of the agency's decisionmaking.

The 2016 Letter does not represent otherwise. It explicitly and repeatedly states that it expresses the views of "staff," and it explains that such views do not bind the Commission. While the letter does present a conclusive view that "outbound telemarketing calls made using soundboard are subject to [the TSR] . . . and can only be made legally if they required with [the TSR]," J.A. 32, it characterizes this as "staff's opinion" and nowhere presents this as the conclusive view of the Commission. To the contrary, the 2016 Letter is clear that agency staff is "merely expressing *its* view of the law," *AT&T v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001) (emphasis added). Indeed, nonbinding *staff* advice is precisely what Call Assistant sought in its specific "request for a FTC <u>Staff Opinion Letter</u>," J.A. 230 (emphasis in original).

True, the fact that staff and not an agency head has taken a challenged action does not end the finality inquiry. But the 2016 Letter differs significantly from decisions by subordinate officials we have deemed final agency action. Unlike the guidance at issue in *Appalachian Power v. EPA*, the 2016 Letter is not binding on Commission staff "in the field" or on third parties such as state permitting authorities. *Cf.* 208 F.3d 1015, 1022, 1023 (D.C. Cir. 2000) ("The short of the matter is that the Guidance, insofar as relevant here, is final agency action, reflecting a settled agency position which has legal consequences both for State agencies administering their permit programs and for companies like those represented by petitioners who must obtain Title V permits in order to continue operating."). Nor is SBA trapped without recourse due to the indefinite postponement of agency action. *Cf. Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) ("[A]lthough . . . the EPA concededly made no final

decision on petitioners' request that the section 115 remedial process be initiated, it clearly and unequivocally rejected . . . petitioners' requests for a separate proceeding[.]"). SBA concedes it could, but did not, seek an opinion from the Commission itself – and SBA remains free to do so today. *Cf. Sackett*, 566 U.S. at 127 (holding an order issued by the agency itself to be final when "not subject to further agency review"); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986) ("Having definitively stated its position that Ciba-Geigy has no statutory right to a cancellation hearing, EPA has provided its final word on the matter short of an enforcement action." (alterations, citation, and quotation marks omitted)).

The dissent repeatedly cites *Sackett* as authority for its conclusion that informal staff advice is final agency action. *Sackett* is a very different case. There, the EPA Administrator issued a compliance order against the Sacketts under the "Enforcement" section of the Clean Water Act, 33 U.S.C. § 1319. The Administrator's order made enforceable factual findings and legal conclusions that the Sacketts' property included "waters of the United States" subject to the Clean Water Act, and that the Sacketts therefore had committed violations of the Clean Water Act. 566 U.S. at 124-25. The order directed the Sacketts "immediately [to] undertake activities to restore" their property "in accordance with [an EPA-created] Restoration Work Plan" and to provide to EPA employees "access to the Site . . . [and] access to all records and documentation related to the conditions at the Site." *Id.* at 125 (alterations in original). The Sacketts sought a hearing on the order from the EPA, which EPA denied, prompting the Sacketts (having no other recourse) to bring suit in the district court.

The Supreme Court analyzed the Administrator's order separately under each prong of *Bennett*. Under the first prong,

the Administrator's order was the consummation of the agency's decisionmaking process because the Sacketts sought a hearing, and when that request was denied, "the 'Findings and Conclusions' that the compliance order contained were not subject to further agency review.'" 566 U.S. at 127. This alone sufficiently distinguishes the informal staff opinion in this case from the Administrator's enforcement order in *Sackett*, as the informal staff opinion is "subject to further agency review" in at least two ways. First, SBA is and has always been able to request an opinion from the Commission itself; given that Call Assistant specifically emphasized that they sought a "Staff Opinion Letter," a request for *Commission* advice remains an available alternative of which the requestors of the 2009 Letter were well aware – and which they chose not to pursue. Second, if at some future date the FTC staff make the further decision to recommend a TSR enforcement action against a soundboard user, proceeding on that recommendation would require the Commission to decide – itself, for the first time – whether the 2016 Letter's interpretation of the TSR is correct, and to vote on whether to issue a complaint. 16 C.F.R. § 3.11. SBA seeks a shortcut around both these decision points, but unlike the Sacketts, SBA is neither out of regulatory review options nor subject to an order or enforcement action issued from the head of the agency itself.

Further, the FTC regulations expressly delineate between advice from the Commission and advice from its staff. The manner in which an agency's governing statutes and regulations structure its decisionmaking processes is a touchstone of the finality analysis. *See Holistic Candlers*, 664 F.3d at 944. Under FTC rules, when the Commission itself gives advice, it may only rescind or revoke that advice upon "notice . . . to the requesting party so that he may discontinue the course of action taken pursuant to the Commission's advice." 16 C.F.R. § 1.3(b). Advice from the Commission

also constrains its future enforcement authority: It "will not proceed against the requesting party with respect to any action taken in good faith reliance upon the Commission's advice under this section, where all the relevant facts were fully, completely, and accurately presented to the Commission . . . ." *Id.*

A separate provision governs "[a]dvice rendered by the staff." 16 C.F.R. § 1.3(c). Staff advice is given "without prejudice to the right of the Commission to later rescind the advice and, where appropriate, to commence an enforcement proceeding," and § 1.3(c) has no notice requirement and provides no safe harbor for reasonable reliance on the advice.[2] *Id.* Unlike Commission opinions, staff advice cannot constrain the Commission's future enforcement authority. Thus, contrary to SBA's assertions, the 2016 Letter's disclaimer is not fairly read as meaningless "boilerplate." Rather, the 2016 Letter reflects and cites specific FTC regulations that structure the agency's decisionmaking processes. *Cf. Scenic Am.*, 836 F.3d at 56 (dismissing as "boilerplate" an agency's vague statement that it "may provide further guidance in the future as a result of additional information"). While an opinion from the Commission itself might constitute the consummation of its

---

[2] We note a textual distinction between § 1.3(b), which provides that the Commission may "rescind or revoke" its own advice, and § 1.3(c), which provides only that the Commission may "rescind" staff advice. We conclude this is a distinction without a difference. Courts and agencies frequently use the terms "rescind"/"rescission" and "revoke"/"revocation" interchangeably, *e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51-52 (1983), and we find no indication that "revoke" must have an independent meaning here. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004) ("[O]ur preference for avoiding surplusage constructions is not absolute.").

decisionmaking process, the 2016 Letter from FTC staff does not.

The dissent interprets the FTC's regulations differently, concluding that the Commission has "delegated" – in the dissent's terms – its advice function such that the staff actually speaks directly for the Commission, despite express disclaimers and regulatory distinctions between staff and Commission advice. Dissenting Op. at 4. We do not agree.

Quoted in full, Section 1.3(a) provides, "[o]n the basis of the materials submitted, as well as any other information available, and if practicable, the Commission *or its staff* will inform the requesting party of its views." 16 C.F.R § 1.3(a) (emphasis added). The dissent's theory of complete "delegation" of the Commission's interpretation and enforcement authority, such that staff and Commission advice are interchangeable for finality purposes, is simply incorrect. When the Commission delegates its authority to staff, it does so expressly. *Cf.* 16 C.F.R. § 2.1 ("The Commission *has delegated* to the Director, Deputy Directors, and Assistant Directors of the Bureau of Competition, the Director, Deputy Directors, and Associate Directors of the Bureau of Consumer Protection and, the Regional Directors and Assistant Regional Directors of the Commission's regional offices, without power of redelegation, limited authority to initiate investigations.") (emphasis added); § 2.14(d) ("The Commission *has delegated* to the Directors of the Bureaus of Competition and Consumer Protection, their Deputy Directors, the Assistant Directors of the Bureau of Competition, the Associate Directors of the Bureau of Consumer Protection, and the Regional Directors, without power of redelegation, limited authority to close investigations.") (emphasis added). By contrast, 16 C.F.R.

§§ 1.1 *et seq.* say nothing about delegation. Rather, the Commission "has authorized its staff to consider all requests for advice and to render advice, where practicable, in those circumstances in which a Commission opinion would not be warranted."[3] 16 C.F.R. § 1.1(b). The fact that the Commission "has authorized" staff to give advice on matters of lesser importance does not transform staff views into the Commission's views. To the contrary, under the plain text of the 16 C.F.R. § 1.1, if "a Commission opinion [is] not [] warranted," a Commission opinion is not provided. Only a staff opinion is provided. *See* 16 C.F.R. § 1.3(b), (c).

**B.**

The dissent criticizes the majority for "measur[ing] finality exclusively from the Commission's vantage point" because we conclude that failure to meet *Bennett*'s first prong is sufficient to dismiss for want of finality. Dissenting Op. at 1. But it is undisputed that *both* prongs of *Bennett v. Spear* must be satisfied independently. *Sw. Airlines*, 832 F.3d at 275. *Bennett* directs courts to look at finality from the agency's perspective (whether the action represents the culmination of the agency's decisionmaking) and from the regulated parties' perspective (whether rights or obligations have been determined, and legal consequences flow). Deficiency from either perspective is sufficient to dismiss a claim. Thus, there is no need to reach

---

[3] To authorize is "to empower; to give a right or authority to act" generally. BLACK'S LAW DICTIONARY 122 (5th ed. 1979); *see also id.* at 121 (defining "authority" as "permission"). Delegation is narrower and more specific – to delegate is to give someone authority to act specifically *on one's behalf* or *in one's stead*. *See id.* at 383 (defining "delegate" as "a person who is delegated or commissioned to act in the stead of another"). Delegation may be one species of authorization, but the distinction is material.

the second *Bennett* prong if the action does not mark the consummation of agency decisionmaking. We therefore need not do so here.

We respond to some of the dissent's concerns out of respect for our colleague and to clarify the appropriate finality analysis. The dissent is troubled that judicial review of informal agency advice would be unavailable here where, according to SBA's characterization, companies have relied on the 2009 Letter in conducting and growing their operations. Certainly, reasonable reliance interests of regulated parties should often be considered when an agency changes course. But the facts matter. SBA's members do not have any significant or reasonable reliance interests in the 2009 Letter, either by the letter's own terms or under FTC regulations. Call Assistant specifically requested an informal "Staff Opinion Letter" (emphasis Call Assistant's) on the applicability of the TSR to soundboard; in that request, Call Assistant made representations about how it used soundboard in order to provide the staff with a factual basis for such an opinion. J.A. 230. In express reliance on these factual representations, the FTC staff stated its opinion that, if these particular facts were true, the TSR would not prohibit the use of soundboard, at least for the uses described by Call Assistant. J.A. 38. The 2009 Letter emphasized that the staff opinion extended only to soundboard use as factually portrayed in Call Assistant's letter soliciting the opinion. Call Assistant did not state anywhere in its letter or supporting materials that call-center agents would use soundboard to field multiple simultaneous calls; instead, Call Assistant highlighted how the technology would allow an agent to better interact with a caller and accurately convey information to a caller. *See* J.A. 230-35. Thus, even if the 2009 Letter had been binding on the Commission, it did not bless the practice of using soundboard to field multiple calls simultaneously, and it therefore does not appear to be

reasonable for a company to rely upon the 2009 Letter for such uses. SBA members also did not take any affirmative steps to apprise the FTC that soundboard is frequently not used in the manner represented by Call Assistant, even after the issuance of the 2009 Letter; instead, the FTC had to learn that this from its own investigation after receiving numerous consumer complaints and reviewing news reports. If industry actors such as Call Assistant had corrected the factual misrepresentations (by omission) as proactively as they solicited the staff opinion, seven years might not have passed before FTC staff reconsidered and rescinded the 2009 Letter.[4]

Whether a regulated entity is a small business or a large trade association, the bottom line is the same for the finality of an agency's action. Both prongs of *Bennett* must be met. The dissent argues that somehow the impact on industry should

---

[4] The possibility of immediate judicial review of informal advice in these circumstances might make guidance harder for industry to request and receive. Not only might staff be less willing to give advice, the advice that is released may take longer and be more costly to develop. Further, allowing informal staff opinions of this sort to be brought into court immediately would cast judges in a role for which they are particularly ill-prepared: providing advisory opinions about the policy merits and applicability of agency actions on an underdeveloped record. The broad interpretation of finality advocated for by the dissent would, contrary to *Abbott Labs.*, "entangle[e] [courts] in abstract disagreements over administrative policies." 387 U.S. at 148. While it may serve the short-term interest of SBA's members to bring this particular grievance to court immediately, the incentives of such a result would harm the interest of all regulated parties in access to informal advice and compliance help in general. These practicalities are reflected in the plain text of the FTC regulations that distinguish Commission advice from staff advice and that provide staff advice more flexibility by making it rescindable without notice and giving it no precedential effect.

have been accounted for in the staff's decisionmaking, and the failure to account for practical impacts somehow makes informal staff advice more final. That approach bootstraps *Bennett*'s second prong into its first. The point where an agency's decisionmaking process is complete cannot be pulled to and fro by the gravity of any particular decision for an industry. Such an unmoored approach to evaluating the finality an agency's decision would create uncertainty for everyone – the agency, the industry, and the courts.

Indeed, if regulated entities could assert a dramatic impact on their industry no matter who issued the advice or under what regulatory authority, the first prong of *Bennett* would have little meaning. Say some advice is issued by a paralegal, who writes a letter on no authority but his or her own personal opinion. And say that advice – if adopted by the Commission itself – could have significant industry consequences. Under the dissent's approach, it is unclear what would stop a regulated party from claiming that what matters for finality is potential industry impact, not whether a paralegal's opinion constitutes the culmination of agency decisionmaking. This is one reason why precedent emphasizes the importance of *who* made a decision, and how an agency's regulations delineate responsibility for and the bindingness of such a decision. *See Abbott Labs.*, 387 U.S. at 151; *Holistic Candlers*, 664 F.3d at 944. The fact that an opinion of someone at an agency could potentially impact a regulated entity says nothing about whether that opinion is the culmination of the agency's decisionmaking.[5]

---

[5] Our dissenting colleague appears to believe that FTC staff has an obligation to proactively investigate whether the facts being represented by an entity requesting advice are false or incomplete.

In addition, we do not believe finality can be measured by what the industry claims it will do or stop doing. The test is what legal and practical consequences will flow from the *agency's* action. Here, it is unclear that much, if any, of the claimed consequences for industry could properly be attributed to the 2016 Letter at all. Even from this underdeveloped record it appears that the practices that prompted the 2016 Letter –

Dissenting Op. at 20. This is mistaken. Commission regulations provide that the Commission or the staff will provide advice "[o]n the basis of the materials submitted." § 1.3(a). There is no obligation on the part of FTC staff to investigate further. In fact, FTC regulations expressly provide that "a request for advice will ordinarily be considered *inappropriate* where . . . [a]n informed opinion cannot be made or could be made only after extensive investigation, clinical study, testing, or collateral inquiry." 16 C.F.R. § 1.1 (emphasis added). The fact that the regulations authorize "the Commission or its staff" to use "any other information available" when providing advice "if practicable" simply allows – but does not require – the use of any other information that may be in the agency's possession. A request for informal staff advice is not a petition for rulemaking, nor is it an adjudication requiring investigative fact-finding by the agency. The onus is on requestors of advice to provide accurate information to form the basis of that advice – notably, FTC regulations provide a safe harbor against enforcement only "where all the relevant facts were fully, completely, and accurately presented to the Commission." 16 C.F.R. § 1.3(b). *See also* 16 C.F.R. § 1.2(a) ("Submittal of additional facts may be requested [by the agency from the party requesting advice] prior to the rendering of any advice."). Therefore, as both the FTC's regulations and the staff advice letters make clear, staff or Commission advice is only as good as the facts on which it is based, and at least in the circumstances here, the primary responsibility for developing and presenting those facts lies with the requestor.

such as soundboard agents handling multiple calls at a time – may not be permissible under the 2009 Letter's interpretation of the TSR. In addition, even if the staff's interpretation were adopted or enforced by the Commission, many permissible soundboard uses remain. More importantly, if the soundboard industry built its business on practices that do not conform to the facts as represented by Call Assistant, they have no cause to complain about the impact of rescinding the 2009 Letter on those practices. In any event, under FTC regulations, the 2009 Letter is not and could not be a basis for legally cognizable reliance interests because it was not issued by the Commission. 16 C.F.R. § 1.3(b).

Finally, the dissent relies heavily again on *Sackett* to argue that the 2009 and 2016 Letters constitute final agency action under *Bennett*'s second prong. While we need not and do not conduct a full analysis of this prong, we note significant differences between the EPA Administrator's order setting out express legal obligations in *Sackett* and the informal staff advice here. The *Sackett* Court concluded that "through the order, the EPA 'determined' 'rights or obligations'" because, "[b]y reason of the order, the Sacketts have the legal obligation to 'restore' their property . . . and must give the EPA access to their property and to 'records and documentation related to the conditions at the Site.'" *Sackett*, 566 U.S. at 126. In contrast, the informal staff advice in the 2016 Letter offers an interpretation of the TSR, but it fixes no specific, legally enforceable rights or legal obligations of the kind created by the Administrator's order in *Sackett*. As the FTC conceded, the 2016 Letter might be used to show an SBA member's knowledge regarding the meaning of the TSR and, therefore, could be *evidence* of willfulness should an SBA member violate *the TSR*. But, unlike a violation of the Administrator's

order in *Sackett*, a so-called "violation" of the 2016 Letter does not independently trigger any penalties.

We respect our dissenting colleague's concern for consequences to the soundboard industry in this case, but we cannot agree that these consequences are sufficient to render informal FTC staff advice final agency action.

## IV.

SBA also argues the 2016 Letter violates its free-speech rights by subjecting it to the TSR's alleged content-based restrictions on constitutionally protected speech. As SBA's counsel conceded at oral argument, however, SBA pleaded the alleged free-speech violations as APA claims only, not standalone First Amendment claims. We therefore need not reach the FTC's arguments that SBA's speech claims are either forfeited or time-barred, as these claims must also be dismissed for want of final agency action.[6]

\* \* \*

Pursuant to FTC regulations and by its own terms, the 2016 Letter does not constitute the consummation of the

---

[6] We note a subtle but important distinction between prudential doctrines such as ripeness, where the presence of constitutional claims may favor judicial review, and the APA's statutory prerequisite of final agency action, without which no cause of action or claim exists. *See John Doe, Inc. v. DEA*, 484 F.3d 561, 567 (D.C. Cir. 2007) (opinion of Edwards, J.) ("[E]ven if exhaustion, ripeness, and finality may be difficult to distinguish in some contexts, they must be carefully delineated when, as here, finality is a statutory jurisdictional prerequisite rather than merely a precaution related to concreteness and institutional capacity."); *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 745-46 (D.C. Cir. 1987) (opinion of Williams,

Commission's decisionmaking process regarding the applicability of the TSR to soundboard technology. Without final agency action, SBA lacks a cause of action under the APA. We therefore vacate the decision below and dismiss the complaint for failure to state a claim.

*So ordered.*

---

J.) ("[W]hile courts often mingle the three doctrines [of finality, ripeness, and exhaustion], they are analytically distinct. . . . While exhaustion is directed to the steps a litigant must take, finality looks to the conclusion of activity by the agency."). Unlike reviewability doctrines developed by courts, final agency action is a statutory requirement set by Congress. We have found no decision of this Court, and no decision of any other circuit court, holding that the presence of constitutional claims eases the Supreme Court's two-part *Bennett* test for final agency action. *Cf. Unity08 v. FEC*, 596 F.3d 861, 865 (D.C. Cir. 2010) (finding First Amendment chilling concerns relevant to ripeness while explicitly distinguishing ripeness from finality of agency action); *Chamber of Commerce v. FEC*, 69 F.3d 603-04 (D.C. Cir. 1995) (finding the presence of First Amendment speech claims to favor pre-enforcement ripeness when finality was conceded). Regardless, SBA has not argued for such a doctrinal shift.

MILLETT, *Circuit Judge*, dissenting: Why let reality get in the way of a good bureaucratic construct? In holding that the 2016 Letter from the Federal Trade Commission's Division of Marketing Practices is not a judicially reviewable "final agency action," the court's opinion focuses on the Commission's structuring of its own regulations to preserve its right to disagree (or not) with the Division at some "later" date. 16 C.F.R. § 1.3(c). In so doing, the court's opinion measures finality exclusively from the Commission's vantage point.

But there are two sides to this story. Finality is supposed to look at *both* whether "the agency's decisionmaking process" has "consummat[ed]," and the reality of whether "rights or obligations have been determined" by or "legal consequences will flow" from the challenged agency action. *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted). And in deciding whether the agency process has ended for purposes of *Bennett*'s first prong, courts must look beyond the agency's say-so to objective and practical indicia of finality. *See*, *e.g.*, *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (holding that compliance order that triggers potential penalties is final even though agency provided for ongoing "informal discussion" and consideration of the accuracy of its findings).

In this case, the agency's emphatic and directive language in the 2016 Division Letter, combined with the absence of any avenue for internal administrative review, unleashes immediate legal and practical consequences for the industry, forcing its members to choose between complying by shuttering their businesses or exposing themselves to potentially significant financial penalties. When agency action threatens such severe repercussions, the "mere possibility that an agency might reconsider" does not deprive the action of finality. *Sackett*, 566 U.S. at 127.

In my view, the Administrative Procedure Act should not countenance an agency telling an individual or industry that its business must end, while fending off court review on the ground that its own internal administrative processes have not ended. Because the structure of the Commission's regulations, the substantive content of the Division's Letter, the absence of an internal appeal mechanism, and the consequences that flow from it together render the Division's 2016 Letter the end of the agency's process, I respectfully dissent.

**A**

Courts must examine finality in a "flexible" and "pragmatic way," considering the impact of delayed review on both the agency action and the regulated entities. *Ciba-Geigy v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) (internal quotation marks and citation omitted); *see United States Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (applying the "'pragmatic' approach we have long taken to finality"); *Federal Trade Comm'n v. Standard Oil Co.*, 449 U.S. 232, 239 (1980) ("[C]ases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way.") (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

Applying that pragmatic test, I acknowledge that the Federal Trade Commission has dressed the Division's advice up with some of the trappings of non-finality. Commission regulations say that "[a]dvice rendered by the staff is without prejudice to the right of the Commission later to rescind the advice and, where appropriate, to commence an enforcement proceeding." 16 C.F.R. § 1.3(c). Also, the Division says in its 2016 Letter that it is "express[ing]" only the views of Commission "staff," and that the Letter has "not been approved or adopted by the Commission," nor is it "binding upon the

3

Commission." Letter from Lois C. Greisman, Assoc. Dir., Div. Mktg. Practices, to Michael Bills, Former Chief Exec. Officer, Call Assistant 4 (Nov. 10, 2016) ("2016 Division Letter").[1]

But a closer look at the Commission's regulations governing agency advice reveals the 2016 Division Letter to be, for all practical purposes, a definitive agency position that concludes the administrative process for the foreseeable future.

*First*, advisory opinions by different divisions of the Commission are not some independent or detached endeavor. Instead, all requests for advisory opinions must first be submitted to the Secretary of the Commission. 16 C.F.R. § 1.2(a). Then, "[o]n the basis of the materials submitted, as well as any other information available," the Commission "will inform the requesting party of its views," *id.* § 1.3(a), through either the issuance of an opinion by the Commission itself, *id.* § 1.1(a), or the Commission deputizing agency staff to "render [the] advice," *id.* § 1.1(b); *see id.* ("The Commission has authorized its staff to consider all requests for advice and to render advice, where practicable, in those circumstances in which a Commission opinion would not be warranted."); *see* 16 C.F.R. § 0.7 ("The Commission * * * may delegate, by published order or rule, certain of its functions to a division of the Commission * * * or an employee * * *.").[2]

---

[1] *Available at* https://www.ftc.gov/system/files/documents/ advisory_opinions/letter-lois-greisman-associate-director-division- marketing-practices-michael-bills/161110staffopsoundboarding. pdf.

[2] According to the regulations, a Commission opinion is warranted only when the "matter involves a substantial or novel question of fact or law and there is no clear Commission or court precedent," or the "subject matter of the request and consequent publication of

As a result, when staff issues advisory opinions to industry, it does so at the Commission's direction and as its delegate. For this case, that means the Commission itself has already decided that this matter does not warrant a Commission decision and is best handled by delegating the decision to the enforcement Division.[3] In fact, leaving Division staff to provide regulatory advice appears to be par for the course with the Commission. Of the 59 advisory opinions published on the Commission's website, 57 have been issued by staff; only 2 were issued by the Commission itself. *See* FED. TRADE COMM'N, *Advisory Opinions*, https:// www.ftc.gov/policy/advisory-opinions (last visited April 17, 2018). And neither of those Commission decisions purported to review a staff advisory opinion.[4] That pattern of regulatory

---

Commission advice is of significant public interest." 16 C.F.R. § 1.1(a).

[3] In this case, an industry member requested staff advice following the adoption of the Telemarketing Sales Rule, 16 C.F.R. § 310, and the Commission directed the staff to issue an opinion. Staff initially advised in 2009 that the Rule would not apply to soundboard technology. Letter from Lois C. Greisman, Assoc. Dir., Div. Mktg. Practices, to Michael Bills, Chief Exec. Officer, Call Assistant (Sept. 11, 2009), https://www.ftc.gov/sites/default/files/documents/ advisory_opinions/opinion-09-1/opinion0901_1.pdf ("2009 Division Letter"). Staff revisited and "revoked" its advice in the 2016 Letter based on new fact findings about the nature of soundboard technology when used for telemarketing. *See* 2016 Division Letter, *supra*, at 3.

[4] One Commission letter addressed a matter in the first instance. *See* Letter from Donald S. Clark, Sec'y, FED. TRADE COMM'N, to Rozanne M. Anderson, ACA Int'l & Andrew M. Beato, Stein, Mitchell & Mezines, LLP (June 23, 2009), https://www. ftc.gov/ system/ files/documents/advisory_opinions/federal-trade-commission-advisory-opinion-clarifying-intersection-fair-debt-

5

delegation of decisions to staff weighs in favor of finality. *See Kobach v. Election Assistance Comm'n*, 772 F.3d 1183, 1190 (10th Cir. 2014) (finding that internal delegation to Executive Director of the Election Assistance Commission rendered his decision final).

That the regulation says it "authorize[s]" staff to render advice, rather than "delegates" to staff, is neither here nor there semantically. *See* Op. at 17–18. The ordinary meaning of "authorizes" is to empower a person to act or speak for another. *See* BLACK'S LAW DICTIONARY 123 (5th ed. 1979) (defining "authorize" as "[t]o endow with authority or effective legal power, warrant, or right."); *see also* MERRIAM-WEBSTER ("[T]o endorse, empower, justify, *or permit by or as if by some recognized or proper authority*.") (emphasis added); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 89 (New College ed. 1976) ("To grant authority or power to."). That is also what a delegation does. *See* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 349 (New College ed. 1976) (defining "delegate" as "to commit to one's agent or representative."). Here, the Commission specifically decided that the Division was best suited to speak on this matter, and that the Commission would not weigh in. It is that fact of deputization that matters in

collection-practices-act/p064803facta-adop-1.pdf. The other came almost thirteen years after an advisory opinion by agency staff had issued. *See* Letter from Donald S. Clark, Sec'y, FED. TRADE COMM'N, to Jonathan Sheldon & Carolyn Carter, Nat'l Consumer Law Ctr. (May 3, 2012) (continuing the longstanding position adopted by staff), https://www.ftc.gov/system/files/documents/advisory_ opinions/16-c.f.r.part-433-federal-trade-commission-trade–regulation-rule-concerning-preservation-consumers-claims/ 120510advisoryopinion holderrule.pdf.

determining finality, not which synonym for conferring authority the agency uses.

*Second*, nothing in the regulations governing advisory opinions labels those delegated decisions as non-final or just a first round in the agency process. Instead, the regulatory scheme treats the advisory letter as concluding the process for obtaining the agency's position on legal matters. 16 C.F.R. § 1.3(a) (request for Commission advice will be answered by either "the Commission or its staff * * * inform[ing] the requesting party of its views").

Notably, the Commission's regulations do not provide a process for appealing or obtaining any form of internal review of staff opinions. Instead, the decision whether to issue advisory opinions directly or through agency staff rests exclusively with the Commission. 16 C.F.R. § 1.2(a), 1.3(a). Individuals seeking agency advice cannot control that decision, no matter how many times they might try to get the Commission itself to weigh in. *See also* Oral Arg. Tr. 31–32 (Commission counsel acknowledges that, while the Association "certainly could make the request" for review of the Division's decision, "the Commission [is] not certainly bound to issue an opinion[.]"). And as mentioned, precious few requests succeed in prompting the Commission to weigh in. If the Commission itself answers only 3% of requests for advice, as its history suggests, and if the Commission has never once intervened to "review" the opinion of its subdivisions, the numbers themselves evidence that the Division's advice here was the agency's final word.

Like the Sacketts, Soundboard has no "*entitlement* to further agency review." *Sackett*, 566 U.S. at 127 (emphasis added). The court is unmoved, reasoning that Soundboard could either request an advisory opinion from the Commission

or await enforcement. Op. at 15–16. But the Commission has already decided that this issue does not meet the criteria for a Commission opinion. Soundboard's ability to keep knocking on a door that will not open is as beside the point here as it was in *Sackett:* "The mere possibility that an agency might reconsider * * * does not suffice to make an otherwise final action nonfinal." *Sackett*, 566 U.S. at 127; *see also Hawkes Co.*, 136 S. Ct. at 1814 (where the agency decision is typically not revisited, the "possibility" of further consideration "does not make an otherwise definitive decision nonfinal").

Nor does the option to await a penalty-seeking civil enforcement action strip agency action of finality. The Supreme Court has repeatedly held that parties need not "wait[] for [the agency] to drop the hammer in order to have their day in court." *Hawkes Co.*, 136 S. Ct. at 1815 (internal quotation marks omitted); *see Sackett*, 566 U.S. at 127 ("But the Sacketts cannot initiate [an enforcement] process, and each day they wait for the agency to drop the hammer, they accrue, by the Government's telling, an additional $75,000 in potential liability."); *see also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 490 (2010) ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law.") (internal quotation marks, citation, and alteration omitted).

*Third*, while the Commission emphasizes that the regulations expressly reserve its right "later to rescind the advice" of staff, 16 C.F.R. § 1.3(c), that language actually supports finality. To begin with, the same qualification about potential rescission applies, almost verbatim, to indisputably final Commission opinions. *Id.* § 1.3(b) ("Any advice given by the Commission is without prejudice to the right of the Commission to reconsider the question involved, and, where the public interest requires, to rescind or revoke the action.").

Indeed, even without that regulatory reservation, the ability of agencies to reverse course is well-settled, so long as they reasonably explain themselves. *See Telecommunications Research & Action Ctr. v. Federal Communications Comm'n*, 26 F.3d 185, 193 (D.C. Cir. 1994) ("We have long recognized that an agency's view of what is in the public interest may change * * *. When that happens, we require only that the agency changing its course supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (internal quotation marks, alterations, and citation omitted).[5]

In addition, the regulation's requirement that the Commission "rescind" Division opinions underscores that, unless the Commission takes that affirmative step, the Division opinion operates as a statement of the agency's position. After all, "rescind" means "[t]o make void; to repeal or annul" a legally operative document, as in to "rescind the legislation." BLACK'S LAW DICTIONARY 1499 (10th ed. 2009); *see also* THE NEW OXFORD AMERICAN DICTIONARY (2d ed. 2005) (defining "rescind" as to "revoke, cancel, or repeal (a law, order, or agreement): *the government eventually rescinded the directive*"). One does not "rescind" a mere suggestion or informal advice.

Further, the regulation speaks only of the Commission reserving the power to rescind the staff opinion "later." 16 C.F.R. § 1.3(c). Framed that way, the ability to rescind is just a tool the Commission keeps in its back pocket; it does not mean that Division advice that the Commission chooses to leave in place is only half-baked or tentative. The opposite is

---

[5] *See also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances.").

true. Once staff "inform[s] the requesting party of its views," *id.* § 1.3(a), that is the agency's final answer, unless and until there is a later change of heart. The simple fact that the Division's decision could (or could not) "be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000); *see id.* at 1023 (concluding that interpretive and policy statements may constitute final, consummated action if they are otherwise "final" in nature).

*Fourth*, the Administrative Procedure Act is explicit that an agency action remains reviewable "final" agency action notwithstanding the availability of appeal to a "superior agency authority," unless agency rules render the initial agency decision "inoperative" pending such appeal. 5 U.S.C. § 704. Nothing in the Commission's regulations provide for appeal to the Commission, let alone render the Division's 2016 Letter inoperative until reviewed. To the contrary, the regulations are explicit that whatever opinion issues is the Commission's answer to the request for its views, 16 C.F.R. § 1.3(a), and the decision will take effect on whatever date the staff decides— here, May 12, 2017. *See* 2016 Division Letter, *supra*, at 4 ("[T]he revocation of the September 2009 letter will be effective six months from today, on May 12, 2017."). In short, as in *Sackett*, the Commission's regulations provide "no entitlement to further agency review," 566 U.S. at 127, or even a second bite at the advisory apple.

The opinion for the court also points out that staff decisions do not afford regulated entities the same "safe harbor" protections from enforcement as formal Commission opinions do. Op. at 16–17; *see* 16 C.F.R. § 1.3(b) (providing that, when all relevant facts have been disclosed and agency orders complied with, the "Commission will not proceed against the requesting party with respect to any action taken in

good faith reliance upon the Commission's advice under this section").

The regulations certainly do make that formal distinction. But it bears noting that the Commission in an enforcement action cannot extract penalties unless the defendant had "actual knowledge or knowledge fairly implied * * * that [its] act is unfair or deceptive and is prohibited by [Commission] rule." 15 U.S.C. § 45(m)(1). Reasonable reliance on a staff advisory opinion would thus seem to inoculate the regulated entity against liability for penalties. Presumably that is why the soundboard industry continued its business practices without Commission challenge for seven years on the basis of the 2009 Division Letter advising that the Telemarketing Sales Rule did not apply. And presumably that is also why the Division felt obliged before reversing its legal position in the 2016 Letter to (i) undertake a months-long investigation, (ii) conduct multiple meetings with industry members, and (iii) afford industry members six months' lead time to come into compliance before enforcing the agency's new position.

In other words, while the formal protections differ for Commission-rendered advice, the differential in practice seems small, and whatever delta remains says nothing about the finality of the Division's 2016 Letter for purposes of judicial review.[6]

---

[6] The court responds that Soundboard lacked any basis for reasonable reliance here because the facts Call Assistant provided to the agency in 2009 did not reflect reality. That puts the cart ahead of the horse since judicial review is where parties can contest the accuracy and substantiality of agency factual determinations. 5 U.S.C. § 706 (providing for judicial review of final agency action "unsupported by substantial evidence"). Anyhow, that same point would be just as true if the Commission were to issue an indisputably final

**B**

Consistent with that regulatory structure, the 2016 Division Letter itself speaks in final, conduct-altering, and compliance-demanding terms, leaving the regulated businesses to either knuckle under or face a penalty-seeking enforcement action.

**1**

To begin with, the Letter states unqualifiedly that telemarketing calls using soundboard technology "are subject" to the "plain language of the [Telemarketing Sales] [R]ule," 16 C.F.R. § 310.4(b)(1)(v). 2016 Division Letter, *supra*, at 3. So going forward, calls "*can only be made legally* if they comply with the [rule's] requirements." *Id.* (emphasis added). For both agency officials on the sending end and industry on the receiving end, there is nothing preliminary, tentative, or qualified about that message.

In case that shot across the industry's bow were not warning enough, the 2016 Division Letter then gives notice that the newly announced application of the Telemarketing Sales Rule to soundboard technology "will be effective six months from today." 2016 Division Letter, *supra*, at 4. That six-month

---

Commission opinion. *See* 16 C.F.R. § 1.3(b) ("The Commission will not proceed against the requesting party with respect to any action *taken in good faith reliance* upon the Commission's advice under this section, *where all the relevant facts were fully, completely, and accurately presented* to the Commission[.]"). What matters to finality is that staff letters, even if not formally granted safe harbor protection, functionally serve the same purpose in that, by dint of the knowledge requirement, they will generally preclude imposition of penalties where regulated entities have reasonably relied on the agency's advice.

lead time, the Letter explains, is to afford the industry sufficient time to "make [the] necessary changes to bring themselves into compliance" with the law. *Id.* The agency thus "views its deliberative process as sufficiently final to demand compliance with its announced position." *Ciba-Geigy*, 801 F.2d at 436. And when agency action is final enough that business-ending compliance is expected by a date certain, it should be final enough for judicial review. What is final for the goose should be final for the gander.

The 2016 Division Letter also identifies no avenue for further Commission review on the question. Worse, the Letter snuffs out any hope for a change of heart by explaining that its broadside against the use of soundboard technology in telemarketing calls is commanded by the "plain language" and "plain meaning" of the Telemarketing Sales Rule. 2016 Division Letter, *supra*, at 3. Specifically, the Division said:

> The plain language of the [Telemarketing Sales Rule] provision governing prerecorded calls imposes restrictions on "any outbound telephone call that delivers a prerecorded message." It is indisputable that calls made using soundboard technology deliver prerecorded messages. As such, under the plain meaning of the words in the [Telemarketing Sales Rule's] prerecorded call provision, outbound telemarketing calls using soundboard technology are covered because such calls "deliver a prerecorded message."

*Id.* The Division's position thus "admit[s] of no ambiguity" or possibility of modification. *Ciba-Geigy*, 801 F.3d at 437. If, as the Commission acknowledges, Appellee Br. 53–54, the Telemarketing Sales Rule on its face plainly foreordains the

2016 Letter's conclusion, exactly what more is industry supposed to wait for?

Even more importantly, the consequences to industry that flow from compliance with the Division's 2016 Letter are dire, "forc[ing] many users to downsize or close their doors altogether." Soundboard Br. 13. The Division knew this when issuing the letter. The Soundboard Association told the Division that extending the Telemarketing Sales Rule to soundboard technology would "decimate[] an industry" and "[e]liminate[] jobs for persons with a variety of disabilities[.]" J.A. 62. "Because the letter largely outlaws soundboard, the many businesses that manufacture or distribute soundboard technology will have no choice but to close down entirely or, at a minimum, dramatically scale back their operations. That will lead to the loss of thousands of jobs across those industries alone." J.A. 113 (quoting Declaration of Arthur F. Coombs III, Dkt. 2-2).

In addition, telling industry that telemarketing can no longer "lawfully" be undertaken with their technology will require industry "to scrap the soundboard technology systems in which they have invested millions of dollars and countless hours of development and training," and to "lay off many—and, in some cases, all—of the thousands of people whom the companies have trained and, for years, paid good salaries to[.]" Dkt. 2-2 at 11–12*; see also* Dkt. 2-2 at 10 (compliance with the 2016 Division Letter will "eliminate 80% or more of [company] revenue," and dampen sales even in areas not subject to the Telemarketing Sales Rule); Dkt. 2-3 at 3–4 (affirming that one company will be forced to make massive layoffs and will lose over $3 million invested in soundboard technology as a result of the Division's 2016 letter).

Neither the Commission nor the Division denies that those consequences will ensue.

To be sure, the 2016 Division Letter ends with the caveat that the advisory opinion has "not been approved or adopted by the Commission," and does "not bind[]" it. 2016 Division Letter, *supra*, at 4. But the 2016 Letter then quickly intones that it nonetheless "reflect[s] the views" of the Division "charged with enforcement of the [Telemarketing Sales Rule]." *Id.*[7] And the Commission, for its part, decided to publish the 2016 Letter on its website, right alongside Commission advice (which also takes the form of a letter to the requesting party).[8]

Anyhow, such boilerplate qualifications are not enough to fend off judicial review of otherwise final agency action. In *Appalachian Power Co.*, the EPA's advisory guidance contained an even more forceful caution, emphasizing that "[t]he policies set forth in this paper are intended solely as guidance, do not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party." 208 F.3d at 1023. Such "boilerplate," which the EPA—like Commission staff here—routinely included at the end of guidance documents, was not enough "'to keep the proceduralizing courts at bay.'" *Id.* (quoting Peter L. Strauss, Comment, *The Rulemaking Continuum*, 41 DUKE L.J. 1463,

---

[7] *See* 16 C.F.R. § 0.16 (The Bureau "investigat[es] alleged law violations, conducts compliance investigations and initiates proceedings for civil penalties to assure compliance with final Commission orders[.]"); *id.* § 2.1 (delegating authority to the Bureau to initiate investigations); *id.* § 2.5 (noting that delegated agents conduct investigations).

[8] *See* FED. TRADE COMM'N, *Advisory Opinions*, https://www.ftc.gov/policy/advisory-opinions (last visited April 17, 2018).

1485 (1992)); *see* FED. TRADE COMM'N, *Advisory Opinions*, https://www.ftc.gov/ policy/advisory-opinions (last visited April 17, 2018) (documenting that all of the Commission's staff advisory opinion letters contain the same or nearly identical cautionary language as the 2016 Letter).

Likewise, in *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525 (D.C. Cir. 1990), we held that an assistant EPA administrator's letter constituted final agency action notwithstanding a concluding demurral that the letter represented only the assistant's personal thoughts and not those of the agency, *id*. at 1532. What mattered was that the assistant, who was the principal advisor for the matters at issue, laid out a decidedly non-tentative interpretation of the governing statute that was "unambiguous and devoid of any suggestion that it might be subject to subsequent revision." *Id*.

So too here. The Division's 2016 Letter speaks with the announced authority and expertise of the Telemarketing Sales Rule's enforcer. There is nothing tentative or interlocutory about its declaration that the plain meaning of federal law requires Association members to shutter most if not all of their telemarketing business. Nor is there any administrative appeal process. In other words, the writing is on the wall, and a line of routine boilerplate cannot erase it.

**2**

The final straw that collapses the Commission's claim of non-finality is the "legal consequences [that] flow" from the 2016 Division Letter. *Sackett*, 566 U.S. at 126 (internal quotation marks, citation, and alterations omitted). Federal law empowers the Commission to file civil enforcement actions for penalties against those who violate Commission rules governing unfair or deceptive trade practices, including the Telemarketing Sales Rule, if the defendants had "actual

knowledge or knowledge fairly implied" that their conduct was "prohibited by such rule." 15 U.S.C. § 45(m)(1); *see* 16 C.F.R. § 1.98 (addressing penalty amounts). Each individual "violation" subjects the offender to up to a roughly $40,000 penalty, 16 C.F.R. § 1.98. And for ongoing violations, each day the conduct continues "shall be treated as a separate violation," 15 U.S.C. § 45(m)(1)(C). Penalties could thus quickly snowball into more than $1 million a month or roughly $14.5 million a year for each single contract held by a soundboard company.[9]

As counsel for the Commission agreed at oral argument, the specificity and directness of the 2016 Division Letter's conclusion that the Telemarketing Sales Rule outlaws the use of soundboard technology "certainly[] * * * would be a factor" in establishing the knowledge required to trigger an enforcement action and financial penalties, and it is something that "a reasonable business would take into account." Oral Arg. Tr. 33. Given the 2016 Letter's warning to industry that

---

[9] At oral argument, counsel for the Commission indicated that each individual phone call "would be a violation," which would accumulate even more rapidly into crushing financial penalties. Oral Arg. Tr. 24. Like the Supreme Court in *Sackett*, this court need not definitively resolve the amount of penalties that the law might ultimately permit in these circumstances. 132 U.S. at 126 & n.3 (assuming without deciding that government is correct about liability for penalties). What matters to finality analysis is the "Government's current litigating position," grounded in statutory text, that failure to comply with the 2016 Division Letter could provide a legal basis for substantial civil penalties, *id*. at 126. That risk is a specific and concrete legal consequence that flows from the challenged agency action. *See id.* And because the Division Letter spawns such legal exposure, the mere possibility that prosecutorial discretion later down the road could reduce the amount of penalties says nothing about the finality of agency action *now*.

the use of soundboard technology is "plain[ly]" unlawful, 2016 Division Letter, *supra*, at 3, any failure to comply would put a business at substantial risk of not only an enforcement action, but also significant penalties running back to the date of this so-called non-final Letter. The 2016 Division Letter thus is not, as the court's opinion would have it (Op. 24), mere "evidence." Op. at 24. The Letter lights the liability fuse; it is the difference between severe financial penalties and no penalties at all. *See Sackett*, 566 U.S. at 120 (noting that legal consequences flow from the EPA's order because it "exposes the Sacketts to double penalties in future enforcement proceedings").

The Division's message to industry is clear: Proceed at your own peril. Finality principles will not allow the Commission to brush off that "immediate and practical impact" of the Division's announcement. *Frozen Food Express v. United States*, 351 U.S. 40, 44 (1956). The clear and explicit announcement in the 2016 Division Letter about the reach of the Telemarketing Sales Rule's "plain language," 2016 Division Letter, *supra*, at 3, "warns" every member of the soundboard industry to either reshape "the manner in which an important segment of the * * * business will be done" or run the "risk" of civil penalties, *Frozen Food Express*, 351 U.S. at 44. When an agency's "authoritative interpretation" and demand for "compliance" means business's "only alternative to costly compliance" is "to run the risk of serious civil * * * penalties," finality attaches and the time for judicial review has come. *Ciba-Geigy*, 801 F.2d at 437–439; *see Hawkes Co.*, 136 S. Ct. at 1815 (holding that parties "need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of serious criminal and civil penalties"); *Sackett*, 566 U.S. at 126 (finding that the Army Corps' action had "all of the hallmarks of APA finality that our opinions establish" because, *inter alia*, it "exposes the Sacketts

to double penalties in a future enforcement proceeding"); *Rhea Lana, Inc. v. Department of Labor*, 824 F.3d 1023, 1025 (D.C. Cir. 2016) ("By notifying Rhea Lana that the company was in violation of its wage-and-hour obligations, the letter rendered knowing any infraction in the face of such notice, and made Rhea Lana susceptible to willfulness penalties that would not otherwise apply.").

Also, the risks to which the soundboard industry is exposed in this case are magnified because the 2016 Letter threatens enforcement actions and substantial penalties against speech. Given the Telemarketing Sales Rule's varied prohibitions and exceptions pertaining to the scope of outlawed speech, the "legal consequences [that] flow" from the 2016 Letter include the chilling of potentially constitutionally protected speech. *Bennett*, 520 U.S at 178; *cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011) (striking down selectively imposed content- and speaker-based burdens on the commercial speech of pharmaceutical manufacturers as unconstitutional under the First Amendment).

Accordingly, the Division's declaration that the soundboard industry needs to shut up and shut down by a date certain should weigh heavily in the finality calculus. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 485–486 (1975) (finding state court decision "final" in part because "[d]elaying final decision of the First Amendment claim until after trial will leave unanswered an important question of freedom of the press under the First Amendment, an uneasy and unsettled constitutional posture [that] could only further harm the operation of a free press") (internal quotation marks and alterations omitted); *see also Blount v. Rizzi*, 400 U.S. 410, 416–417 (1971) (noting that prior restraints "require 'prompt

judicial review' * * * to prevent the administrative decision of the censor from achieving an effect of finality").[10]

Given all of that, the Division's 2016 Letter comfortably fits the mold of cases in which we have held that the actions of subordinate agency officials qualify as final agency action. *See Safari Club Int'l v. Jewell*, 842 F.3d 1280 (D.C. Cir. 2016) (Fish and Wildlife press release adopting position of Division of Scientific Authority constitutes final agency action); *Rhea Lana, Inc.*, 824 F.3d at 1025 (letter from subordinate official informing company of agency's longstanding interpretation of the Fair Labor Standards Act is final agency action); *Appalachian Power Co.*, 208 F.3d at 1021–1022 (guidance drafted by subordinate EPA officials constitutes final agency action); *Her Majesty the Queen*, 912 F.2d at 1531 (letter of assistant EPA official—with explicit caveat that it contained only a personal opinion—constitutes final agency action); *Natural Res. Def. Council, Inc. v. Thomas*, 845 F.2d 1088, 1093–1094 (D.C. Cir. 1988) (memorandum drafted by subordinate EPA official constitutes final agency action); *Ciba-Geigy Corp.*, 801 F.2d at 435 (letters issued by director of pesticide programs constitute final agency action).

* * * * *

As the opinion for the court notes, agency advice that is genuinely advisory can play an important role in allowing the regulators and regulated to communicate effectively and work

---

[10] The opinion for the court cabins consideration of any potential chilling effect to the ripeness inquiry alone. Op. at 25 n.5. But factors relevant to ripeness often bear on finality as well. *See Ciba-Geigy*, 801 F.3d at 435 (considering finality as a component of ripeness).

together in coordinating voluntary compliance measures and improving the effectiveness of regulatory programs.

But "such a 'count your blessings' argument is not an adequate rejoinder to the assertion of a right to judicial review[.]" *Hawkes Co.*, 136 S. Ct. at 1816. If agencies want to give advice, they should speak in advisory terms, allow for internal review, or not attach substantial consequences to noncompliance with what is supposed to be mere advice.

To be sure, allowing judicial review in this case might increase the fact-finding burden on agencies issuing advisory opinions, but that will only be true for a certain subset of decisions—those with unambiguous pronouncements of a legal position, announced compliance dates, and substantial legal consequences for failure to fall in line. And those seem to be precisely the cases in which the law should force agencies to take a harder look, to substantiate their judgments, and to submit their decisions to judicial review. If the agency does not yet have all the facts or is not yet committed to its position as a matter of statutory policy, perhaps it should finish the job before telling an industry to shutter its operations.

At bottom, finality is about agency accountability for the decisions it makes and the consequences it unleashes. The Division's 2016 Letter, after all, is not about just adjusting or modifying business behavior to comport with regulatory standards. Rather, the Letter announces that plain regulatory language broadly condemns as illegal an entire business model. The Letter then assigns a date certain by which businesses are expected to comply by largely ceasing their operations, laying off employees, and writing off significant financial investments. Failure to toe the Division's line will expose the soundboard industry to potentially severe penalties, with no right first to administrative appeal or review. The Division

Letter leaves the soundboard industry whipsawed between abandoning its business and facing potentially ruinous enforcement actions and penalties. In these circumstances, the benefits of informal and collaborative interchange between the regulator and the regulated have evaporated. And the agency should not be able to transmogrify the mantle of "staff advice" into both a sharp regulatory sword and a shield from judicial review.

No doubt a technology used for telemarketing is hardly a sympathetic poster child for a dissenting opinion. But the pride of our legal system is its evenhandedness and fairness to all who come before it. Plus the issue here is not whether the Commission can regulate the soundboard industry or telemarketing. It is only whether the Commission must own up to the regulatory actions it has set in motion, and whether those who are told to close up shop and discharge their employees are entitled first to a day in court. In my view, if the law requires us to treat the 2016 Division Letter and its business-ending consequences as just some informal, take-it-or-leave-it staff suggestion, then the law is being stingy with reality. I respectfully dissent.