# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

Argued February 12, 2016   Decided August 9, 2016

No. 15-1036

SOUTHWEST AIRLINES CO.,
PETITIONER

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,
RESPONDENT

DELTA AIR LINES, INC.,
INTERVENOR

—————

On Petition for Review of an Order of the
United States Department of Transportation

—————

*M. Roy Goldberg* argued the cause for petitioner. With him on the briefs was *Robert W. Kneisley*.

*Benjamin M. Shultz*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Michael S. Raab*, Attorney, *Paul M. Geier*, Assistant General Counsel for Litigation, U.S. Department of Transportation, *Peter J. Plocki*, Deputy Assistant General Counsel for Litigation, and *Charles E. Enloe*, Trial Attorney.

*Jeffrey M. Harris* argued the cause for intervenor. With him on the brief were *Paul D. Clement*, *Edmund G. LaCour*, *Jr.*, *Kenneth P. Quinn*, and *Jennifer Trock*.

Before: SRINIVASAN and WILKINS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: Southwest Airlines seeks our review of a letter from the Department of Transportation (DOT) to the City of Dallas addressing competition policies for airlines operating at Love Field airport. According to Southwest, the views expressed by DOT in the letter are substantively incorrect and procedurally improper. We dismiss Southwest's petition for review because we find DOT's letter does not constitute a final agency action, a prerequisite to our review. In particular, the letter does not reflect the consummation of DOT's decisionmaking on the issues it discusses. DOT in fact has instituted an administrative proceeding (which remains ongoing) that will address and resolve, among other things, the precise issues and policies broached in the letter. Because we conclude that the challenged letter is not a final agency action, we dismiss Southwest's challenge.

I.

A.

Southwest Airlines, Love Field, and the City of Dallas have a long and somewhat complicated history. Love Field served as Dallas's municipal airport starting in the 1920s. The City of Fort Worth (located about thirty miles away) operated its own municipal airports.

In 1964, federal regulators required the two cities to designate a single airport to service the Dallas-Fort Worth metropolitan area, leading to the construction of the Dallas/Fort Worth International Airport (DFW). In order to ensure that all commercial air traffic would be routed through DFW instead of the municipal airports, all interstate commercial carriers agreed to transfer their service to DFW. Southwest refused to move. In 1973, a federal court ruled that Southwest must be allowed to operate from Love Field as an intrastate commuter airline. *City of Dallas v. Southwest Airlines Co.*, 371 F. Supp. 1015 (N.D. Tex. 1973), *aff'd*, 494 F.2d 773 (5th Cir. 1974).

A few years later, federal regulators allowed Southwest to begin interstate service to New Orleans from Love Field. Some Members of Congress raised concerns "that if Southwest were to operate on an unrestricted basis from Love Field (closer to Dallas than DFW) many travelers to and from Dallas would choose that option rather than using DFW, thus undermining the economic viability of DFW." *Kansas v. United States*, 16 F.3d 436, 438 (D.C. Cir. 1994). Congress responded by enacting the Wright Amendment, named for then-Texas Representative and Speaker of the House Jim Wright. The Wright Amendment confined interstate commercial air traffic from Love Field to Texas's four border states: Louisiana, Arkansas, Oklahoma, and New Mexico. Pub. L. No. 96-192 § 29, 94 Stat. 35, 48-49 (1980). (Congress later added Kansas, Alabama, and Mississippi to that list. Pub. L. No. 105-66 § 337(b), 111 Stat. 1425, 1447 (1997).)

In July 2006, the Cities of Dallas and Fort Worth, the DFW Airport Board, American Airlines, and Southwest agreed to seek the repeal of the Wright Amendment in order to allow interstate service from Love Field to the rest of the

country. The contract embodying their agreement became known as the "Five-Party Agreement." Later that year, Congress enacted the Wright Amendment Reform Act of 2006 (WARA), codifying many provisions of the Five-Party Agreement. Pub. L. No. 109-352, 120 Stat. 2011 (2006). The WARA ended all geographic limitations on flights from Love Field as of October 13, 2014, and limited the number of gates at Love Field to twenty. *Id.* §§ 2, 5(a). Southwest leases sixteen of those twenty gates and also subleases two of the remaining gates.

B.

In the petition before us, Southwest challenges a Department of Transportation guidance letter addressing "accommodation" policies at Love Field. Accommodation is a process by which an airline can gain access to operate flights from an airport at which it leases no gates. One of the airport's tenant airlines "accommodates" the non-tenant airline's flights by letting the non-tenant airline use one or more of the accommodating tenant's gates. Accommodation may be voluntary, in the form of an agreement between two airlines. Accommodation also may be forced, when the airport requires a tenant airline to make room for a non-tenant airline.

The accommodation procedures for Love Field are set out in the airport's gate lease with tenant airlines. The lease contains provisions for both voluntary and forced accommodation, as well as a "scarce resource provision," which calls for the City to choose which airline will be forced to accommodate a new entrant (if necessary) and sets out the terms for an accommodation. The WARA also speaks to accommodation at Love Field, requiring the City to "determine the allocation of leased gates and manage Love

Field in accordance with contractual rights and obligations" as they existed on WARA's effective date and to "honor the scarce resource provision of the existing Love Field leases" when "accommodat[ing] new entrant air carriers." Pub. L. No. 109-352 § 5(a), 120 Stat. 2011, 2012 (2006).

Two federal statutes addressing airport operations and competition—the Airport and Airway Improvement Act, 49 U.S.C. §§ 47101, *et seq.*, and the "Competition Plan" statute, *id.* § 40117(k)—also pertain to accommodation. In order to receive funds under either statute, most airports, including Love Field, must submit a "competition plan" to DOT, outlining "the availability of airport gates and related facilities, leasing and sub-leasing arrangements, gate-use requirements, gate-assignment policy, [and] financial constraints." *Id.* §§ 47106(f), 40117(k). In 2009, the City of Dallas submitted its most recent plan for Love Field, which DOT approved.

Before receiving a grant through the Airport and Airway Improvement Act, an airport must also agree in writing to a number of grant assurances, including, for example, that it "will be available for public use on reasonable conditions and without unjust discrimination," *id.* § 47107(a)(1), and will give no airline "an exclusive right to use the airport," *id.* § 47107(a)(4). If DOT believes an airport has breached one of the grant assurances, the agency, acting through the Federal Aviation Administration (FAA), may initiate an administrative process to investigate—and if necessary adjudicate—the alleged noncompliance. *See* 49 U.S.C. § 47122; 14 C.F.R. §§ 16.1(a)(5), 16.101. That process is known as a "Part 16" proceeding.

6

C.

In 2014, Delta Airlines sought voluntary accommodation to fly five daily flights out of Love Field. Having no luck with the tenant airlines, it sought assistance from the City, invoking the City's obligations to accommodate non-tenant airlines under the grant assurances and the City's competition plan for Love Field. Delta, the tenant airlines, and the City then exchanged a flurry of letters and emails debating whether, and on what terms, one of the tenant airlines should be forced to accommodate Delta. On December 1, 2014, the City notified the tenant airlines that it was invoking the process for forced accommodation set out in the airlines' leases.

Shortly thereafter, the City sought guidance from DOT about the City's legal obligations under the grant assurances and competition plan. On December 17, 2014, DOT responded with a letter—the one at issue in this case—providing "guidance" to the City. In the letter, DOT made the following statements discussing its understanding of the City's obligations to force accommodation of a non-tenant airline:

> Our competition plan policy requires airport proprietors to assist requesting carriers seeking access, and we expect that, if a requesting carrier is unable to arrange a voluntary accommodation with a signatory carrier, the City will accommodate the requesting carrier to the extent possible given the current gate usage, without impacting current or already-announced, for-sale services by the signatory carriers.

> With respect to the length of the accommodation, for the accommodation to be meaningful at [Love Field], it is our position that, once accommodated, the accommodated carrier is entitled to an ongoing similar pattern of service as long as the carrier continues to operate the accommodated flights. Importantly, the accommodated carrier should not be pushed out by incumbent carriers at a later date. It is the City's responsibility to continue the accommodation and ensure that space is available so that the requesting carrier is able to maintain its pattern of service on an ongoing basis, based on the available space on the snapshot date of the original accommodation request, even after the expiration or termination of any agreement between the accommodated carrier and signatory carriers.

DOT's December 17, 2014 Letter, at 2 (J.A. 002).

On February 13, 2015, Southwest filed a petition for review of the letter, giving rise to this case. Southwest disputes the substance of DOT's letter on two fronts: (i) DOT's position that the City should determine a tenant airline's "current gate usage" on a "snapshot date"; and (ii) DOT's position that forced accommodation would continue at least "as long as the [accommodated] carrier continues to operate the accommodated flights." *Id.* Southwest's concerns grow out of its plans to increase its service at some point after the "snapshot date" referenced in DOT's letter. Southwest contends that forced accommodation of Delta based on the snapshot date, for as long as Delta operates accommodated flights, would impair its ability to increase its schedule as it desires. In Southwest's view, its right to increase its service

should supersede any accommodation claim Delta might have.

After receiving the December 17 letter, the City took no action to implement DOT's guidance. Rather, the City asked the agency for additional guidance. *See* Compl. at ¶ 76, *City of Dallas v. Delta Air Lines, Inc.*, No. 15-cv-02069 (N.D. Tex. June 17, 2015). In response, DOT sent the City another guidance letter. On August 13, 2015, Southwest filed a petition for review of the second letter. That case has been held in abeyance pending the outcome of this one.

Meanwhile, and significantly for our purposes, on August 7, 2015, the FAA initiated a Part 16 proceeding to assess the City's compliance with its grant obligations. *See* Notice of Investigation, *In re Compliance with Federal Obligations by the City of Dallas*, FAA Docket No. 16-15-10 (Aug. 7, 2015). In its notice initiating the proceeding, the FAA explicitly stated that the December 17 letter was not its final word on the accommodation issue. *See id.* at 10 n.12. And although the City is the only respondent in the proceeding, the FAA invited Southwest, Delta, and other interested airlines to participate in the proceeding by filing briefs "containing any information or argument that it believes the FAA should consider." Notice of Opportunity, FAA Docket No. 16-15-10 (Nov. 6, 2015).

## II.

In its petition for review of DOT's December 17 letter, Southwest argues that DOT's guidance violates the accommodation terms of Southwest's lease, and thus also infringes the WARA's statutory command that the City honor the scarce resource provision of the Love Field gate leases. Southwest further contends that the letter amounts to a

legislative rule for which the Administrative Procedure Act (APA) required prior notice and opportunity for comment. *See* 5 U.S.C. § 553.

Southwest's petition for review invokes this court's jurisdiction under 49 U.S.C. § 46110(a). That provision gives us jurisdiction over DOT and FAA "order[s]" as defined in the APA: "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making." 5 U.S.C. § 551(6); *SecurityPoint Holdings, Inc. v. TSA*, 769 F.3d 1184, 1187 (D.C. Cir. 2014). To be subject to judicial review under the APA, an FAA order must be a *final* agency action. *See id.*

In *Bennett v. Spear*, the Supreme Court established a two-part test for determining whether an agency action qualifies as final so as to be subject to judicial review:

> First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted). An order must satisfy both prongs of the *Bennett* test to be considered final. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006).

We conclude that the DOT's December 17 letter fails at the first prong. In assessing whether a particular agency action qualifies as final for purposes of judicial review, this

court and the Supreme Court have looked to the way in which the agency subsequently treats the challenged action *See, e.g., U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813-14 (2016); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478-79 (2001); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1349 (D.C. Cir. 2014); *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012). In *McCarthy*, for instance, we found a guidance document was non-final in part because there was no indication that the agency had applied the guidance as if it bound regulated parties. 758 F.3d at 253.

Here, we conclude that the agency's initiation of a Part 16 proceeding—to resolve, among other things, the very issues addressed in the challenged December 17 letter—undermines Southwest's claim that the letter marked the consummation of the agency's decisionmaking process. When the FAA opens an investigation under Part 16, it sends a notice of investigation to "the person(s) subject to investigation" (in this case, the City), setting forth its concerns and rationale and requesting a response within 30 days. 14 C.F.R. § 16.103. The FAA's notice here makes clear that the agency did not consummate its decisionmaking process in the December 17 letter (or thereafter). The notice specifies that the "City will be afforded a full opportunity to raise arguments in this proceeding on . . . any . . . relevant topic *including the guidance provided by the DOT letters of December 2014* and June 2015." Notice of Investigation at 12 (emphasis added). The notice further states that, "[b]ecause the [December 17] letter only offered guidance, it was not intended to constitute a definitive resolution of the dispute." *Id.* at 10 n.12.

The agency, moreover, did more than simply issue a post-hoc statement characterizing a prior action (the December 17 letter) as non-final. DOT put its money where its mouth is, so to speak. The agency invested its time and resources in undertaking exactly the type of action—a Part 16 proceeding—that will lead to a final resolution of the matters addressed in the letter. And it went further: it specifically stated in the Notice of Investigation that it would entertain arguments about the guidance set forth in its prior letters, and it invited Southwest (and other interested parties) to participate and file a brief on those issues.

We thus have no occasion in this case to consider whether an agency's mere characterization of a previously issued guidance letter as open to reconsideration would suffice to render the letter non-final. Here, the agency did more than simply *say* it would give further consideration to issues addressed in its prior guidance: it instituted the process by which it could do so, confirming that the December 17 letter is not the agency's final word on the issues at hand.

The Part 16 process will afford an opportunity to address the issues Southwest raises in its petition here. In fact, the submissions in the Part 16 proceeding raise for the agency's consideration the very issues Southwest claims were finally decided in the December 17 letter. *See* Response of Southwest Airlines Co. at 38-49, FAA Docket No. 16-15-10 (Dec. 23, 2015); Invited Brief of Delta Air Lines, Inc. at 15-19, FAA Docket No. 16-15-10 (Dec. 23, 2015); Response of the City of Dallas at 71, 79-87, FAA Docket No. 16-15-10 (Nov. 23, 2015). And the Part 16 process will result in a final decision subject to judicial review. If the FAA and the City cannot resolve the FAA's concerns through informal means, the agency may conduct a hearing to determine the City's compliance with its obligations under the grant assurances, 14

C.F.R. §§ 16.201, 16.202, or the Director may make a determination without a hearing, *id.* §§ 16.105, 16.31. In either case, the initial determination may be appealed to the Associate Administrator for Airports, who issues a final decision. *Id.* §§ 16.33(b), 16.241(b), (c). Such a decision constitutes a final agency action for purposes of the APA and is subject to judicial review in the courts of appeals. *Id.* § 16.247.

The relevant regulations also make clear that any decisions or determinations at earlier stages of the Part 16 process are not final agency actions (and, as such, are not subject to judicial review). *See id.* We would be hard-pressed to find that a letter sent months *before* the initiation of the Part 16 proceeding, addressing issues to be vetted and resolved in that proceeding, is somehow more "final" than the proceeding's non-final, early-stage decisions (which of course come *after* the letter). At the end of the Part 16 proceeding, the agency might ultimately adhere to the views expressed in the December 17 letter, or it might take a different approach. At this point, though, we cannot be sure of the agency's final stance on the issues addressed in the letter.

Southwest contends that the letter nonetheless was final agency action because DOT has not rescinded or disavowed the letter. In making that argument, we note that Southwest necessarily agrees with our approach of examining subsequent agency actions in considering finality—they've explicitly asked us to do so. But Southwest provides no support for its argument, and has pointed us to no cases in which we have required an agency to rescind non-final advice or guidance in order to prove that its decisionmaking process has yet to be consummated. We find the argument unpersuasive.

It is unclear whether Southwest, the City, or any other affected entities at one time may have viewed the December 17 letter as a definitive mandate requiring the City to force accommodation on the terms outlined in the letter. The City, for its part, took no action to implement the guidance set out in the letter, instead seeking further guidance from DOT. In any event, now that the Part 16 process is underway, any such view of the December 17 letter which may have existed at one time would have no continuing force.

Because DOT's December 17 letter did not mark the consummation of the agency's decisionmaking process for purposes of the first prong of *Bennett*'s finality test, the letter was not a final agency action. In light of that conclusion, we have no occasion to reach Southwest's arguments under the second *Bennett* prong. For the same reason, we also do not consider Southwest's contention that the letter amounted to a legislative rule as to which the agency was required to give prior notice and opportunity for comment.

\*   \*   \*   \*   \*

For the foregoing reasons, we dismiss the petition for review.

*So ordered.*